**B.A.A., Appellee,**

v.

**CHIEF MEDICAL OFFICER, UNIVERSITY OF IOWA HOSPITALS, Appellant.**

No. 87–191.

Supreme Court of Iowa.

March 16, 1988.

J. Patrick White, Co. Atty., and Anne M. Lahey, Asst. Co. Atty., for appellant.

David H. Goldman and John G. Black of Black, Reimer & Goldman, Des Moines, for appellee.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and SNELL, JJ.

LAVORATO, Justice.

This appeal presents us with the issue of whether a psychiatric patient may be forced to continue in involuntary commitment when the patient is no longer as "seriously mentally impaired" as the Iowa Code requires for the initial commitment.[1]

The chief medical officer of the University of Iowa Hospitals argues that once a patient has been involuntarily committed because of a serious mental impairment, a lesser impairment is sufficient to continue commitment against the patient's challenge. Bryan, the patient here, contends the Code requires the same degree of impairment for continuing the involuntary commitment as for commencing it.

The district court agreed with Bryan that a patient must remain seriously mentally impaired for commitment to continue and ordered his release pursuant to a writ of habeas corpus because Bryan was no longer "seriously mentally impaired" as defined by the Code. We agree that the Code requires the same degree of impairment for continuation of involuntary commitment as for its commencement and, accordingly, affirm the district court's release of Bryan from the hospital's custody.

I. *Background Facts and Proceedings.*

At the time of his involuntary commitment at the University Hospitals in 1986, Bryan was a twenty-one year old student on leave from a major university, where he had compiled an excellent academic record through his junior year. Bryan had, at this

---

1. We use the terms "commitment," "involuntary commitment," and "involuntary hospitalization and treatment" interchangeably, unless the context otherwise indicates.

point, already undergone a series of voluntary hospitalizations at other institutions for problems with increasingly serious physical symptoms.

When he was admitted as a voluntary patient at the University Hospitals, Bryan was mute, confined to a wheelchair, and unable to attend to such bodily functions as washing or using a toilet. He drooled constantly, had unusual jerking movements of his extremities, and was fed through a nasogastric tube because he complained of being unable to swallow. Physical tests and examinations showed that Bryan's throat problems were not physiological in origin but were probably due to a psychiatric illness. Tube feeding continued for four months at the hospital because of his inability to eat normally, as shown by a dramatic weight loss.

University physicians suggested electroconvulsive therapy (ECT) as the preferred treatment for Bryan's illness, which had been diagnosed as either catatonia or psychotic depression. As a less preferable alternative to ECT treatments, the doctors suggested administering anti-psychotic and anti-depressant medications. Bryan's parents rejected both treatments and sought his transfer to another hospital.

The chief medical officer then applied to the district court for an order committing Bryan to the hospitals for evaluation and treatment. This involuntary commitment process is governed by Iowa Code chapter 229. Under this chapter, "any interested party" may commence commitment proceedings by alleging, with corroborative evidence, that the respondent[2] is "seriously mentally impaired." Iowa Code § 229.6 (1985).

If, after a hearing, the court finds clear and convincing evidence of the respondent's serious mental impairment, the court "shall order the respondent placed in a hospital . . . as expeditiously as possible for a complete psychiatric evaluation and appropriate treatment." *Id.* at § 229.13.

Section 229.1(2) defines "serious mental impairment" as

the condition of a person who is afflicted with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who:

a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment; or

b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the afflicted person if the afflicted person is allowed to remain at liberty without treatment.

"Mental illness" and "serious emotional injury" are defined in sections 229.1(1) and 229.1(3).

In Bryan's case the judicial hospitalization referee found clear and convincing evidence of a serious mental impairment and ordered him to be committed. *See id.* at § 229.21(3). Bryan appealed the referee's decision to the district court, *see id.* at § 229.21(4), and the court, upon its de novo review, *id.*, also found clear and convincing evidence of a serious mental impairment as defined by the Code. The court noted that "if not involuntarily committed, it is most likely . . . [Bryan] would inflict physical injury on himself, either as a direct result of his own actions, or as a direct result of his lack of actions."

The university physicians then began treating Bryan with medication since no consent to ECT treatment had been given. *See id.* at § 229.23(2). Later, Bryan consented to ECT treatments, which, he testified, helped him "considerably." The improvements in Bryan's condition included being able to communicate with others, eat by himself, take care of his bodily functions, and sit in a normal posture. He also no longer drooled profusely.

After ten ECT treatments, however, Bryan decided not to undergo any more because he felt his improvement had

---

**2.** According to Iowa Code § 229.1(4), " '[r]espondent' means any person against whom [a commitment] application has been filed under section 229.6, but who has not been finally ordered committed for full-time custody, care and treatment in a hospital."

"reached a plateau" and he did not want to risk short-term memory loss, a side effect, without any accompanying benefit.

University physicians noted that after discontinuing the ECT treatments, Bryan resumed losing weight and began to drool occasionally. Though the doctors felt that Bryan was no longer suffering from catatonia or psychotic depression, they thought further hospitalization was required because of the symptoms of major depression he still exhibited. The doctors later testified that treatment on an outpatient basis would not have been in Bryan's best interests because of his regression to drooling and weight loss and because of his limited insight into the nature of his illness.

The three reports filed during the commitment by the chief medical officer of the hospitals, *see* Iowa Code § 229.15(2), characterized Bryan as "seriously mentally impaired" and in need of continued hospitalization. *See id.* at § 229.14(2). The last report, however, which was filed immediately before Bryan sought his release, noted that he no longer suffered from psychosis or catatonia.

After the improvement in his condition due to the ECT treatments, Bryan filed petitions for a temporary injunction and for a writ of habeas corpus, seeking his release from involuntary commitment. *See id.* at § 229.37.[3] After granting the temporary injunction, the district court held a hearing on the habeas corpus petition.

Bryan testified, which he had been physically unable to do at his commitment hearing, and articulately exhibited an awareness of his illness and involvement in his treatment. For example, he described why he had chosen certain medication and what therapy he desired in addition to the treatment suggested by university physicians. A psychologist who had examined Bryan also testified and offered the opinion, in essence, that Bryan was no longer seriously mentally impaired, despite his remaining mental illness.

The district court concluded that involuntary commitment was no longer warranted by Bryan's condition, as judged by the definition of "seriously mentally impaired" in section 229.1(2), and it terminated Bryan's involuntary hospitalization and treatment.

The chief medical officer now appeals, arguing that the district court erred by using the definition of "seriously mentally impaired" that governs the initiation of commitment. According to the chief medical officer, a different standard of mental impairment than that defined by section 229.1(2) should be used when deciding under the habeas corpus provision, section 229.37, whether to continue involuntary commitment, because the purpose of the later proceeding is different.

Bryan, on the other hand, contends the district court was correct in applying the section 229.1(2) definition of the phrase in his habeas corpus proceeding. Bryan urges us to affirm the district court's application of an "unambiguous" statute.

We review the district court's decision here, regarding the propriety of continued involuntary commitment, to correct errors of law. *Cf. Madsen v. Obermann,* 237 Iowa 461, 470, 22 N.W.2d 350, 356 (1946).

II. *Meaning of "Seriously Mentally Impaired" in Section 229.37, the Habeas Corpus Provision.*

■ The chief medical officer states the issue on appeal as follows:

Does the same proof of serious mental impairment, as defined in section 229.-1(2), which determines the original issuance of an order for involuntary hospitalization of a person, apply to habeas corpus review [pursuant to section 229.-37] once the person has received treatment, but in the opinion of the treating physician the person is still mentally ill

---

**3.** Section 229.37 provides:

All persons confined as seriously mentally impaired shall be entitled to the benefit of the writ of habeas corpus, and the question of serious mental impairment shall be decided at the hearing. If the judge shall decide that the person is seriously mentally impaired, such decision shall be no bar to the issuing of the writ a second time, whenever it shall be alleged that such person is no longer seriously mentally impaired.

and in need of full time hospitalization and treatment?

As we said above, Iowa Code chapter 229 governs involuntary hospitalization and treatment in our state. After an "interested person" commences commitment proceedings under section 229.6, the district court must decide whether the respondent is "seriously mentally impaired," a condition that is defined in section 229.1(2), set out above.

A patient, *see* Iowa Code § 229.1(5), may challenge the continued involuntary commitment under section 229.37. This section provides that "[a]ll persons confined as seriously mentally impaired shall be entitled to the benefit of the writ of habeas corpus, and *the question of serious mental impairment shall be decided at the hearing.*" (Emphasis added.)

In the present case the chief medical officer contends the definition of serious mental impairment in section 229.37 should be less stringent than the definition in section 229.1(2). The officer argues that in the context of a section 229.37 habeas corpus proceeding, the patient should still be considered seriously mentally impaired, even though no longer dangerous, as long as he or she is still mentally ill and in need of treatment. Simply put, the position of the chief medical officer is that any continued commitment is a medical judgment.

The officer points to section 229.15 as indicative of the legislative intent in support of this position. That section generally requires the chief medical officer to report the condition of the patient to the court on a periodic basis and to advise the court on the need of continuing commitment and treatment. In Bryan's case, the officer asserts, the lesser standard was met through medical testimony that Bryan was still mentally ill and in need of further inpatient hospitalization because he was relapsing.

A. *Historical background.* Before proceeding to an analysis of the meaning of the phrase "seriously mentally impaired" in section 229.37, we think some discussion of the historical background leading to the enactment of our present civil commitment statute would be helpful. This statute, Iowa Code chapter 229, became effective January 1, 1976. 1975 Iowa Acts ch. 139. Before then,

> [t]he requirements demanded for involuntary hospitalization under the [old chapter 229 fell] within the scope of the parens patriae doctrine. This doctrine is derived from the English common law and is inextricably linked to a superiority of the state in its relations with its subjects. Under the parens patriae doctrine the state can act in loco parentis, or in the best interests of the individual citizens of the state. The state is deemed capable of making a decision and acting upon it in the best interests of an individual apart from interests or needs of other members of the general public.
>
> The parens patriae doctrine can be contrasted with its more contemporary counterpart, the police power. This basis of state power is constitutionally limited to acts for the promotion of the health, welfare, or safety of the general public. A literal reading of this constitutionally limited doctrine implies that more than undivided interests must be involved. Some interests in the health, welfare, or safety of more persons than the individual subject to the statute must be involved.

Contemporary Studies Project, *Facts and Fallacies About Iowa Civil Commitment,* 55 Iowa L.Rev. 895, 958–59 (1970) (hereinafter cited as Bezanson & Polson); *see also In re Oseing,* 296 N.W.2d 797, 800 (Iowa 1980).

Our standard for involuntary commitment before 1976 was based on the parens patriae doctrine and allowed an individual to be involuntarily committed on a finding that he or she was "mentally ill and a fit subject for custody and treatment." Iowa Code § 229.9 (1971); Bezanson & Polson, 55 Iowa L.Rev. at 959. Thus, individuals "who [were] not dangerous and [presented] no threat to the health, welfare, or safety of others [could] be involuntarily hospitalized" under this standard. Bezanson & Polson, 55 Iowa L. Rev. at 959.

Our cases interpreting the old statute held that involuntary commitment under it was "substantially free from the limits of procedural and substantive due process safeguards [of the fourteenth amendment to the United States Constitution]." *Id.* at 960; *see also Hansen v. Haugh,* 260 Iowa 236, 246, 149 N.W.2d 169, 174–75 (1967); *Prochaska v. Brinegar,* 251 Iowa 834, 837–38, 102 N.W.2d 870, 871–72 (1960). Our thinking was that involuntary hospitalization was not a loss of liberty within the meaning of the fourteenth amendment. *See, e.g., Prochaska,* 251 Iowa at 838, 102 N.W.2d at 872.

The previously cited 1970 Iowa Law Review article, which is a study of the civil commitment process in Iowa, provided the catalyst for the passage of our present commitment statute. *See* Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa: The 1975 Legislation,* 61 Iowa L.Rev. 262, 262–63 (1975). According to the commentator, the new law was intended to resolve a conflict between the medical and legal perspectives in the area of civil commitment. *Id.* at 266. The important thing to the doctor in this area is "to *treat* as soon and as effectively as possible, recognizing that where illness exists, delay and rigidity of procedure can significantly limit a physician's ability to effectively help the patient, and can detract from the patient's right to treatment." *Id.*

In contrast, the important thing to the lawyer is

> to guard against mistaken commitment and treatment by narrowly defining the types of conditions which require medical assistance, by minimizing constraint in light of the state's purpose, and by mandating certain procedural steps such as a judicial hearing, offering of evidence, and similar safeguards, to ensure to the extent possible that the basis for a decision to institutionalize and treat is sound, and that only those needing treatment are subjected to it.

*Id.*

The new law was designed to accommodate these two competing perspectives in two ways:

First, procedures are designed to facilitate prompt medical evaluation, expeditious decision, and subsequent treatment. Nevertheless, through the right to a hearing, independent psychiatric evaluation, cross-examination, representation by counsel, and decision by an impartial decision-maker, the prospective patient is guaranteed those safeguards necessary to a reliable decision based on full information.

Second, involuntary commitment is restricted to those persons presenting a danger, physical or emotional, to the community. This provision of the statute reflects a recognition of a societal justification for institutionalization or forced treatment as well as the uncertain nature of the medical judgment in the area of mental illness. Mental illness, in short, is not strictly and exclusively a medical concept.

*Id.* at 267. Because the statute does not view the decision to forcibly treat an individual "as an exclusively or even predominantly medical one," the decision to commit does not rest exclusively with the doctor. *Id.* The decision in large part depends on how far society will tolerate "deviant" behavior. *See id.* at 267–68. Likewise, the extent of involuntary commitment "does not rest exclusively on medical judgments; it rests as much on societal judgments with which doctors may be ill-equipped to deal." *Id.* at 268.

The new legislation was also intended to meet the "emerging constitutional requirements." Contemporary Studies Project, *Involuntary Hospitalization of the Mentally Ill in Iowa: The Failure of the 1975 Legislation,* 64 Iowa L.Rev. 1284, 1298 (1980) (hereinafter cited as Stier & Stoebe). In 1967 the United States Supreme Court recognized that commitment proceedings "whether denominated civil or criminal are subject . . . to the due process clause" of the fourteenth amendment. *Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326, 329 (1967). Subsequent Supreme Court decisions make it clear that "civil commitment for any purpose constitutes a significant deprivation of

liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330–31 (1979); *accord Jones v. United States*, 463 U.S. 354, 361, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694, 703 (1983); *Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552, 564 (1980); *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396, 410 (1975) (Burger, C.J., concurring). Moreover, any such commitment must be "justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding." *O'Connor*, 422 U.S. at 580, 95 S.Ct. at 2496, 45 L.Ed.2d at 410 (Burger, C.J., concurring). We have retreated from our previous holdings and, indeed, now recognize that "[i]nvoluntary commitment deprives an individual of his liberty through coercive state action." *Oseing*, 296 N.W.2d at 798.

During the 1970's dangerousness was seen by some courts as a constitutionally required element of any civil commitment decision. *See, e.g., Lynch v. Baxley*, 386 F.Supp. 378, 391 (M.D.Ala.1974), *rev'd on other grounds*, 651 F.2d 387 (5th Cir.1981); *Bell v. Wayne County Gen. Hosp.*, 384 F.Supp. 1085, 1102 (E.D.Mich.1974). Finally, in 1975 the United States Supreme Court in *O'Connor*, its leading decision on civil commitment, embraced the dangerousness requirement:

> A finding of "mental illness" alone cannot justify a state's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that the term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, *there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.*

422 U.S. at 575, 95 S.Ct. at 2493, 45 L.Ed.2d at 406–07; *accord In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986).

Shortly after *O'Connor* was decided, the pre–1976 Iowa civil commitment statute came under attack in *Stamus v. Leonhardt*, 414 F.Supp. 439 (S.D.Iowa 1976). The court held the statute unconstitutional for nine reasons. *See id.* at 453. One of those reasons dealt with the old law's failure to require a showing of dangerousness as a prerequisite to involuntary commitment. *Id.* In condemning the old standard for involuntary commitment, the court said that

> where commitment is possible *solely* on a finding of mental illness (with some rather general references to the interests of the subject), the substantive threshold for allowing commitment under chapter 229 is simply too low. This court therefore holds that the commitment standards of chapter 229 of the Code violated substantive due process by not requiring that subjects pose a serious threat to themselves or others, as evidenced by a recent overt act, attempt or threat. The court is unable to find this standard present in chapter 229 by implication....

414 F.Supp. at 451 (citation omitted). In addition to the substantive due process violation, the court held that the old standard was unconstitutionally vague because the imprecision of the standard provided the decision-makers "too much discretion in determining what constitutes mental illness and what is the subject's 'best interest.'" 414 F.Supp. at 452. For example, "the commitment laws can be applied to people who are merely annoying or bothersome to the decision-makers." *Id.*

Although the new commitment statute was passed before *Stamus* was decided, the new standard for commitment, "serious mental impairment" as defined in section 229.1(2), is thought to meet the required constitutional element of dangerousness. *See, e.g.,* Stier & Stoebe, 64 Iowa L.Rev. at 1298. The standard melds the important elements of the police power and parens patriae doctrines. *See* Bezanson, 61 Iowa L.Rev. at 281. Thus, the state can no longer commit an individual solely because treatment is in the person's best interest under the parens patriae doctrine. There must also be a likelihood that the individual constitutes a danger to himself or others, a reflection of the police power doctrine. In

addition, this danger must be evidenced by a " 'recent overt act, attempt, or threat.' " *Mohr*, 383 N.W.2d at 542 (quoting *Stamus*, 414 F.Supp. at 451); Iowa Sup.Ct.R. for Involuntary Hospitalization of Mentally Ill 13(10).

B. *Analysis of the meaning of "seriously mentally impaired" in section 229.-37*. Against this historical backdrop, we now focus our attention on the meaning of the phrase "serious mental impairment" in the habeas corpus provision, section 229.37.

We have seen that one goal of the new civil commitment statute was to ensure that its standard for commitment would pass constitutional muster. The standard, of course, is spelled out in the definition of "serious mental impairment" in section 229.1(2).

The definition has three elements: the person committed must be found to be "(1) afflicted with a mental illness," consequently (2) to lack "sufficient judgment to make responsible decisions with respect to [the person's] hospitalization or treatment," and (3) to be likely, if allowed to remain at liberty, to inflict physical self-injury or injury to others, or to inflict emotional injury on the designated class of persons. *Oseing*, 296 N.W.2d at 799; *accord Mohr*, 383 N.W.2d at 541. In short, the person committed must be mentally ill, as a result of that illness lack judgmental capacity regarding treatment, and be dangerous.

Dangerousness was included as a constitutionally necessary element of the standard to provide a justification for depriving individual liberty under the state's police power. In other words, the likelihood of physical injury to the person or to third parties, the dangerousness element of the standard, creates a legitimate state interest in commitment.

*O'Connor* mandates that once a justification or legitimate state interest no longer exists, confinement must cease. 422 U.S. at 580, 95 S.Ct. at 2496, 45 L.Ed.2d at 410 (Burger, C.J., concurring). Plainly, then, persons who have been committed because they were dangerous must be released once that condition passes. Our present invol-untary commitment statute was carefully crafted to comply with the *O'Connor* mandate. It does so by (1) assuring continual monitoring of the committed person, (2) requiring the least restraint medically possible, and (3) providing for the person's immediate release once it is determined that the person requires no further treatment for serious mental impairment. *See* Iowa Code §§ 229.13–229.16. In addition, the legislature meticulously conditioned treatment, whether on an inpatient or outpatient basis, on a finding that the person has a serious mental impairment. *See, e.g.,* Iowa Code §§ 229.14, 229.16.

If the legislature's goal to ensure constitutionality of its commitment standard is to be realized, we have no choice but to require a finding of dangerousness whenever involuntary hospitalization or treatment is called into question in a section 229.37 habeas corpus proceeding. *See* Iowa Code §§ 4.4, 4.6. It seems reasonable to us that if dangerousness is required as a condition for the original commitment to meet due process requirements, it should be required for continued involuntary hospitalization and treatment. We cannot accept the "theory that [the] state may lawfully confine an individual thought to need treatment and justify that deprivation of liberty solely by providing some treatment. Our concepts of due process would not tolerate such a 'trade-off.' " *O'Connor*, 422 U.S. at 589, 95 S.Ct. at 2500, 45 L.Ed.2d at 415 (Burger, C.J., concurring).

More is required than the showing of dangerousness. The legislature intended that mental illness and lack of judgmental capacity regarding treatment decisions must also be established in a section 229.37 habeas corpus proceeding. We reach this conclusion for several reasons.

First, rule 25 of the Iowa Supreme Court Rules for Hospitalization supports such a conclusion by implication. That rule provides that when the chief medical officer reports to the court as required in section 229.14, his findings must state *"[t]he basis for his or her conclusion as to respondent's mental illness, judgmental capacity concerning need for treatment; treata-*

*bility; and dangerous."* [4] (Emphasis added.) One commentator has reached a similar conclusion noting that

[t]he statute requires a respondent's serious mental impairment be established as of the time of the decision to commit rather than at some earlier point. *This is true not only with respect to the initial treatment decision, but also for each of the subsequent re-determinations which must be made at a number of identified stages throughout the commitment, evaluation, and treatment process. The standards applicable at each step are the same; at each point the question relates to the respondent's present, not past, condition. This requirement is of crucial importance, for the presence and seriousness of mental disorder, judgmental incapacity, treatability, and dangerousness can fluctuate significantly or occur episodically.*

Bezanson, 61 Iowa L.Rev. at 270 (emphasis added); *see also id.* at 352–53.

Second, support is found in the pre–1976 statute, which also had a habeas corpus provision very similar in language to the present provision and identical in code section number.[5] Our cases interpreting the predecessor provision held it was analogous to an appeal to the district court because it permitted an "inquiry into and a determination as to whether the plaintiff was *in fact a proper subject of detention." Hiatt v. Soucek,* 240 Iowa 300, 305, 36 N.W.2d 432, 435 (1949). The court in *Hiatt* noted that the inquiry would have

been the same had the proceedings originated with the commission on insanity, *see* Iowa Code § 229.9 (1975), and been appealed to the district court. *See id.* Similarly, here in a section 229.37 habeas corpus proceeding, the inquiry is the same as in an appeal to the district court from the original commitment order.

■ Third, when identical language is used in several places in an enactment, we ordinarily give it the same meaning. *Beier Glass Co. v. Brundige,* 329 N.W.2d 280, 286 (Iowa 1983). This is especially true when, as here, the legislature has expressly defined the phrase "serious mental impairment" in section 229.1(2) and has not qualified it in any other section where the phrase is found. Consequently, we agree with Bryan that section 229.37 is clear and unambiguous. "Serious mental impairment" in that section has the same meaning ascribed to it in section 229.1(2).

We also agree with Bryan that the chief medical officer is, in effect, arguing for a return to the constitutionally defective standard of the 1975 version of chapter 229. As we said earlier, that standard only required a showing that a person be mentally ill and a fit subject for custody and treatment.

■ The only grounds for Bryan's continued involuntary hospitalization and treatment presented to the habeas corpus court were (1) a former finding of serious mental impairment, (2) a current finding of mental illness, and (3) the treating physi-

---

**4.** Iowa Code § 229.13 requires the chief medical officer to report to the court no more than fifteen days after commitment, "making a recommendation for disposition of the matter." Iowa Code § 229.14 provides alternatives for care including (1) release from hospitalization and termination of the proceedings if the committed person "does not ... require further treatment for serious mental impairment;" (2) full-time care and treatment if the person is "seriously mentally impaired;" (3) treatment as an outpatient or on another "appropriate basis," if the person is "seriously mentally impaired" and in need of treatment but not full-time hospitalization; and (4) alternative placement, if the person is "seriously mentally impaired" and in need of full-time custody and care, "but is unlikely to benefit from further treatment in a hospital." Iowa Code § 229.15 requires similar

reports not more than thirty days after entry of an order for continued hospitalization under option two of § 229.14 and thereafter at successive intervals of not more than sixty days as long as involuntary hospitalization continues. *See* Iowa Code § 229.15(1). Section 229.15 also requires similar reports not more than sixty days after entry of an order under option three of § 229.14 and thereafter at successive intervals as ordered by the court but not to exceed ninety days so long as the court order remains in effect. *See* Iowa Code § 229.15(2).

**5.** There is a slight and, we think, immaterial difference between the two: in the new version "serious mental impairment" is used in place of "mental illness," which appears in the old provision.

cians' opinions that further hospitalization and treatment were medically indicated.

The evidence is clear and convincing that Bryan presented no likelihood of danger to himself or third parties and that he possessed sufficient judgmental capacity regarding proper medical treatment for himself. *See Oseing,* 296 N.W.2d at 799. Under these circumstances it becomes readily apparent that what the chief medical officer is seeking is unfettered discretion to continue commitment and treatment because Bryan's doctors believed both would be good for him.

Although we have no quarrel with the doctors' humanitarian motives to treat Bryan, we note it was just this kind of discretion that caused the *Stamus* court to brand our previous standard as unconstitutionally vague because of the possibility of arbitrary application of the law. *See Stamus,* 414 F.Supp. at 452. It seems to us the potential for arbitrary application of the law under such a standard is just as great on the question of continued involuntary hospitalization as it is in the initial determination of commitment.

A return to the old standard on the question of continued involuntary hospitalization under section 229.37 would turn the determination of that question into a medical rather than a legal judgment. We conclude such a result was not intended by the legislature nor is it constitutionally permissible.

### III. *Disposition.*

We hold that the phrase "serious mental impairment" in section 229.37 has the same meaning ascribed to it by section 229.1(2). Because there was no showing that Bryan suffered from a serious mental impairment, the district court correctly terminated his involuntary hospitalization. Accordingly, we affirm the district court's decision.

AFFIRMED.