# IN THE COURT OF APPEALS OF IOWA

No. 16-1479
Filed April 5, 2017

IN THE MATTER OF M.E.,
**Alleged to Be Seriously Mentally Impaired,**

**M.E.,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Cherokee County, Charles K. Borth, District Associate Judge.

M.E. appeals the district associate judge's order of continued commitment under Iowa Code chapter 229 (2016). **AFFIRMED.**

Jack B. Bjornstad of Jack Bjornstad Law Office, Okoboji, for appellant.

Thomas J. Miller, Attorney General, and Gretchen W. Kraemer, Assistant Attorney General, for appellee State.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

M.E. appeals an order of the district associate judge (DAJ) continuing her inpatient commitment under Iowa Code section 229.14A (2016). M.E. argues the State failed to prove she lacked sufficient judgment to make responsible decisions about her treatment. The State raises a jurisdictional issue. We find we have jurisdiction to consider M.E.'s appeal, and because there is clear and convincing evidence in the record demonstrating M.E.'s lack of judgmental capacity, we affirm.

## I.    Facts and Prior Proceedings

In early April 2016, a medical provider at Cherokee Regional Medical Center filed an application alleging M.E., who had been diagnosed with schizoaffective disorder, was delusional and experiencing hallucinations. According to police officers who brought M.E. to the medical center, M.E. had been digging through a cigarette-disposal unit and harassing customers at a local Casey's General Store. M.E. told medical staff she had stopped taking her prescribed medications because "they are harmful to me." Following a hearing before the district court on April 22, M.E. was involuntarily committed for inpatient treatment at the Cherokee Mental Health Institute (MHI) pursuant to Iowa Code section 229.13.

In May, June, and July of 2016, M.E. wrote a series of letters to the court requesting a hearing under section 229.14A on her continued placement. The DAJ held a hearing on July 29. Initially, the State offered no evidence at the hearing other than a periodic report from the MHI opining that M.E.'s condition remained unchanged and recommending continued hospitalization. M.E.

requested release for outpatient treatment and then made a statement to the court, specifically raising concerns about the lack of religious services at the MHI, her restricted access to the telephone, and her inability to contact her husband.

She also questioned her course of treatment:

> The medications I am on are wrong, and I think and . . . truly believe, as I do feel—I know my own body. Prolixin decanoate was the one that worked for me. And the only reason that I even went in and out of hospitals was because I was partying. I think I need drug and alcohol treatment.
> . . . .
> . . . . I feel more stable when I'm on that. It just helps me to be myself normally. I've been on it most of my life. And the only reason, like I said, I did come back in and out of the hospital is because I was partying and being mean to people. It had nothing to do with the Prolixin.

M.E. also told the court one of the medications she received at the MHI, Zyprexa, had unpleasant side effects: "It makes me slow down so much that I can't function. I don't know what I'm doing half the time. Right now I'm very—struggling to speak right now."

In response, the State offered the testimony of Mary Baughman, a physician assistant at the MHI. Baughman discussed an alternate oral medication that had worked well to stabilize M.E.'s mood in the past, but because M.E. had refused to take it, Baughman had resorted to Zyprexa, which could be administered through an injection.[1] Baughman testified the side effects

---

[1] Baughman explained how M.E. arrived at her current medication schedule:
> I've done extensive research on the different medications. What seems to work the best for [M.E.] are medications that can only be taken orally and . . . not given by injection, and she refuses to take them. The second tier, then, is to use a mood-stabilizing agent that can be administered if she refuses the pill.
> And so I . . . constantly review her medications and adjustments and try to find the . . . medications with the least amount of side effects that I feel are going to have the biggest benefit.

described by M.E. were actually signs of the medication's benefits: "[I]n my opinion, she struggles when things start to slow her down from her manic high, and I think it's a . . . difficult adjustment. . . . But I . . . think her perception is that it's causing a side effect of fatigue."

Immediately following the hearing, the DAJ issued an order for continued placement. On August 8, 2016, M.E.'s counsel filed a notice of appeal to the district court from the DAJ's findings, citing Iowa Code section 229.21. The district court held a de novo trial on August 29, hearing from the same two witnesses and, on the same day, issued an order determining inpatient commitment should remain in effect. On September 1, 2016, M.E. filed a notice of appeal to the supreme court from the district court's order.

## II. Jurisdiction

As an initial matter, the State argues we do not have jurisdiction to consider this appeal. On December 12, 2016, the State filed a motion to dismiss M.E.'s appeal, asserting the appeal from the DAJ's order for continued placement should have been to the appellate courts rather than to the district court. *See In re P.D.*, No. 00-1882, 2002 WL 1127908, at *3 (Iowa Ct. App. May 31, 2002). The State noted, in *In re L.H.*, No. 16-0185 (Iowa Ct. App. Nov. 4, 2016) (order), our court viewed the district court ruling as void for lack of jurisdiction but considered the appeal from the DAJ's order because the notice of appeal had been timely filed. *See In re L.H.*, ___ N.W.2d ___, ___, 2016 WL 7404593, at *3–4 (Iowa Ct. App. 2016). Here, in contrast, the notice of appeal to the supreme court was filed thirty-four days after the DAJ ruling.

In an order issued on February 15, 2017, we denied the State's motion. We found that although failure to timely file a notice of appeal generally deprives the appellate courts of jurisdiction, requiring us to dismiss the appeal as untimely, *see State v. Olsen*, 794 N.W.2d 285, 289 (Iowa 2011), it was appropriate to grant M.E. a delayed appeal from the ruling of the DAJ, *see Swanson v. State*, 406 N.W.2d 792, 792–93 (Iowa 1987) (recognizing the authority to grant a delayed appeal "where it appears that state action or other circumstances beyond appellant's control have frustrated an intention to appeal" because "[u]nder such circumstances, the denial of a right of appeal would violate the due process or equal protection clause of the fourteenth amendment to the federal constitution"); *see also id.* at 792 n.1 (noting "[t]he same federal constitutional considerations which have forced us to recognize delayed appeals in criminal cases are potentially applicable in some civil settings"). Here, we reasoned denying M.E.'s appeal would have due process implications. *See Blanchard v. Brewer*, 429 F.2d 89, 90–91 (8th Cir. 1970). Because we had no record of the July 29 hearing, we directed the district court to appoint an official judicial branch court reporter to prepare a transcription and ordered the parties to submit amended briefs addressing the record made before the DAJ and the DAJ's ruling.

In its amended appellee's brief, the State again urges us to find we lack jurisdiction to consider M.E.'s appeal. The State argues we should not grant a delayed appeal because "[t]he due process implications do not exist in this case to the same extent they might exist in another case"; for instance, unlike in a

criminal or termination-of-parental-rights case, a respondent can request a placement hearing after each periodic report under Iowa Code section 229.15.[2]

We disagree that the procedural distinctions call for a different outcome. Civil commitment "constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). An individual has the right to be released from continued commitment as soon as it is determined the individual is no longer seriously mentally impaired. *See B.A.A. v. Chief Med. Officer, Univ. of Iowa Hosps. & Clinics*, 421 N.W.2d 118, 124 (Iowa 1988). That M.E. may have more than one opportunity to contest her continued commitment in the future does not diminish her substantial liberty interests. M.E. had a clear intent to appeal her continued involuntary placement. Her intent was thwarted by her attorney's failure to appeal to the correct court, by a delay of three weeks between her first notice of appeal and the de novo hearing, and by the district court's failure to recognize its lack of jurisdiction. We find these exceptional circumstances warrant our consideration of M.E.'s appeal.

III. **Scope and Standard of Review**

We review sufficiency-of-the-evidence challenges under chapter 229 for correction of legal error. *See In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). We are bound by the fact-findings of the district court if they are supported by substantial evidence. *See In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998).

---

[2] A sworn complaint alleging "a named person is not seriously mentally impaired and is unjustly deprived of liberty in any hospital in the state" is another means to challenge a person's confinement. Iowa Code § 229.31. People confined as seriously mentally impaired also have "the benefit of the writ of habeas corpus." *Id.* § 229.37; *see also In re B.T.G.*, 784 N.W.2d 792, 796 (Iowa Ct. App. 2010).

"Evidence is substantial if a reasonable trier of fact could conclude the findings were established by clear and convincing evidence." *B.T.G.*, 784 N.W.2d at 796.

### IV. Analysis

Iowa Code chapter 229 authorizes involuntary civil commitment upon a finding that an individual is "seriously mentally impaired." *See* Iowa Code § 229.13(1). To support a finding of serious mental impairment, the State must present clear and convincing evidence that the individual: (1) has a mental illness, (2) lacks "sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment" because of the mental illness, and (3) is likely, if permitted to remain at liberty, to be a danger to self or others. *See id.* § 229.1(20). "The definition of serious mental impairment does not become less stringent when a person challenges his or her continued commitment." *L.H.*, ___ N.W.2d at ___, ___, 2016 WL 7404593, at *4.

On appeal, M.E. does not dispute that she has a mental illness or that she is likely to pose a danger to herself or others. Accordingly, we address only the sufficiency of the evidence supporting the second serious-mental-impairment element: lack of sufficient judgment. Under this element, the State must prove "the person is unable because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not." *B.T.G.*, 784 N.W.2d at 797 (citation omitted). M.E. contends the only evidence supporting a lack of judgmental capacity was that she refused to take her prescribed medications. According to M.E., she refused medications because she had a rational concern about their side effects. *See J.P.*, 574 N.W.2d at 343

("Concern about the potential side effects of a medication is a reasonable apprehension.").

Substantial evidence in the record supports the DAJ's finding that M.E. lacked judgmental capacity. As the State argues, M.E.'s reason for refusing medication was irrational because, as Baughman testified, what M.E. viewed as a side effect was actually the medication working as intended. Moreover, before receiving injections of Zyprexa, M.E. had refused a number of alternative oral medications, each time complaining of adverse side effects that were "not apparent to anyone else working with her."

These facts distinguish M.E.'s case from *J.P.*, 574 N.W.2d at 343–44, in which the supreme court rejected the State's argument a respondent with an educational background in psychology and counseling lacked sufficient judgment to make responsible decisions about her treatment when the respondent articulated specific concerns about the side effects of her medications and indicated a preference for psychotherapy over chemotherapy. After *J.P.*, our court has found a lack of sufficient judgment based on a respondent's *irrational* refusal to take prescribed medication, even when the respondent expressed concerns about side effects. *See, e.g.*, *In re J.R.*, No. 11-1180, 2012 WL 472879, at *2 (Iowa Ct. App. Feb. 15, 2012) (finding lack of judgment when respondent complained of side effects of injected medicine but refused alternative oral medication or medical assessment of his reported concerns); *In re J.D.H.*, No. 00-820, 2001 WL 355652, at *1 (Iowa Ct. App. Apr. 11, 2001) (finding lack of judgment when respondent refused to take his medications

"because they made him tired" and did not like the way his doctor treated him). We find it appropriate to resolve M.E.'s claim the same way.

M.E.'s refusal had the effect of both limiting the treatment options available to her and preventing her mood and symptoms from stabilizing. At the time of the placement hearing, M.E. had only been taking Zyprexa for about one week. And throughout her placement at the MHI, M.E. continued to display concerning behavior. Baughman testified M.E. had "episodes of time where she becomes extremely agitated and threatening" towards those around her. The record as a whole demonstrates M.E. remains unable to make rational decisions regarding her treatment and hospitalization.

**AFFIRMED.**