784 N.W.2d 792 (2010)
In the Matter of B.T.G., Alleged to be Seriously Mentally Impaired,
B.T.G., Respondent-Appellant.
No. 09-0921.
Court of Appeals of Iowa.
May 12, 2010.
*794 Joan M. Black, Iowa City, for appellant.
Thomas J. Miller, Attorney General, Gretchen Witte Kraemer, Assistant Attorney General, Janet Lyness, County Attorney, and Patricia Weir, Assistant County Attorney, for appellee State.
Heard by SACKETT, C.J., and DOYLE and DANILSON, JJ.
DANILSON, J.
B.T.G. appeals from a district court order of continued commitment and placement in a mental hospital, pursuant to Iowa Code chapter 229 (2009). He contends there is insufficient evidence to support the court's finding that (1) he lacks sufficient judgment to make responsible decisions regarding his treatment, and (2) he currently presents a danger to himself or others. He further argues his counsel was ineffective in failing to subpoena several witnesses to testify as to his involvement in an altercation that occurred at the hospital. We affirm.

I. Background Facts and Proceedings.
In 2004 B.T.G. began serving a fifteen-year sentence for being a habitual offender[1] at the Iowa Medical and Classification Center (IMCC) in Oakdale. B.T.G. has been diagnosed with paranoid schizophrenia, schizoaffective disorder bipolar type with borderline personality disorder traits, mild mental retardation, and has a long-standing history of substance abuse.[2]
While at IMCC, B.T.G. hurt an officer and tried to harm himself. B.T.G. was transferred to the Jasper County Jail in May 2007. Once there, B.T.G. engaged in numerous fights and spent most of his time in segregation. In January 2008, he was charged with assault on a correctional officer. He was transferred back to IMCC in April 2008. After the transfer, B.T.G.'s mental condition rapidly deteriorated. On the day he was transferred, B.T.G. experienced a major episode in which he broke the sprinkler head off the wall in his room, ripped his mattress apart, and screamed and kicked his door. He refused to take doctor-ordered medications and threatened to kill the staff and their children.
On May 2, 2008, the Iowa Department of Corrections Mental Health Director, Dr. Bruce Sieleni, filed an application to commit B.T.G. Following a hearing on May 6, 2008, the hospitalization referee entered an order determining that B.T.G. was seriously mentally impaired and required B.T.G. to undergo a complete psychiatric evaluation *795 and appropriate treatment pursuant to Iowa Code section 229.3. The order also identified the placement facility as IMCC. The hospitalization referee's decision was affirmed on appeal by the district court.
On April 1, 2009, B.T.G. filed a pro se request for a placement hearing. The next day, April 2, his attorney filed an application for hearing on behalf of B.T.G.'s requesting a commitment review and placement review. A review hearing was held on April 7, and on the same day, the judicial hospitalization referee filed an order confirming placement and commitment of B.T.G. On May 5, 2009, B.T.G. filed a pro se notice of appeal of this order.
On May 26, 2009, the district court held a trial de novo, and on May 28 entered an order finding that B.T.G. suffered from a serious mental illness; lacked sufficient judgment to make responsible decisions with respect to his medical treatment or physical care; was likely to injure himself or others physically if released; and was in a placement that was both appropriate and the least restrictive. The court therefore dismissed B.T.G.'s appeal and stated that the referee's order filed April 7, 2009, which confirmed B.T.G.'s placement and commitment, should remain in full force and effect. B.T.G. filed a notice of appeal of the district court's ruling on June 9, 2009.

II. Jurisdiction.
The State contends the district court lacked subject matter jurisdiction in this case because B.T.G. failed to appeal the referee's order within ten days as required by Iowa Code section 229.21(3)(d). A lack of subject matter jurisdiction can be raised at any stage in the proceedings. Klinge v. Bentien, 725 N.W.2d 13, 15 (Iowa 2006); Lloyd v. State, 251 N.W.2d 551, 556 (Iowa 1977). "It is elementary that the court's first duty is to determine its jurisdiction to entertain and decide a case on its merits." Lloyd, 251 N.W.2d at 558. Once a court determines that it lacks subject matter jurisdiction over a claim, it has no power to enter a judgment on the merits and must dismiss the action. Id. "If a court enters a judgment without jurisdiction over the subject matter, the judgment is void and subject to collateral attack." Klinge, 725 N.W.2d at 15.
Before Iowa Code chapter 229 was amended in 2001, our supreme court concluded that chapter 229 did not provide for a specific procedure for a patient to file an application to review the patient's continued commitment and placement except by a habeas corpus petition or commission inquiry proceedings. In re Melodie L., 591 N.W.2d 4, 9 (Iowa 1999); Iowa Code §§ 229.37, 229.31-.36. However, since the supreme court's decision in Melodie L., the Iowa Legislature amended chapter 229 to provide for a limited method to review a patient's placement in addition to a habeas corpus action. See Iowa Code §§ 229.14A, 229.21(3)(d).
Whenever an order is entered either fixing a patient's placement or transferring a patient's placement, the patient must be given notice of a right to request a placement hearing. Id. § 229.14A(1), (2). The request for a placement review hearing must be filed within seven days of the entry of the order, excluding weekends and official holidays. Id. § 229.14A(2), (6).
The record reflects that an order continuing B.T.G.'s placement was entered on March 23, 2009, after receipt of a chief medical officer's report dated March 19, 2009. The order also notifies B.T.G. of his right to a review hearing. Because we conclude that B.T.G.'s application was filed in conjunction with his right to a review hearing pursuant to section 229.14A(1) and (2), B.T.G.'s application was timely and properly filed to review his placement.
*796 Unfortunately, after the referee held a placement review hearing on April 7, B.T.G.'s appeal to the district court was not timely filed within the ten-day period to appeal prescribed by section 229.21(3)(d). As a result, the district court lacked subject matter jurisdiction to consider the merits of B.T.G.'s appeal on his application for a placement review hearing, and we in turn have no jurisdiction to consider the merits of the appeal of the district court ruling as it relates to B.T.G.'s placement.
However, the application filed by B.T.G.'s attorney on April 2, 2009, also requested a review of the commitment of B.T.G. In Melodie L., our supreme court stated that an application requesting to be released from inpatient treatment should be treated as a petition for a writ of habeas corpus. Melodie L., 591 N.W.2d at 9 (citing Halverson v. Iowa Dist. Ct., 532 N.W.2d 794, 799 (Iowa 1995) (noting that a label attached to a motion does not determine its legal significance)).[3] Although the recent amendments to chapter 229 might now permit the application filed in Melodie L. to be treated as an application for a placement review hearing, in this case, B.T.G.'s application filed April 2, 2009, clearly seeks a review of the continued commitment order in addition to B.T.G.'s placement. Thus, we conclude B.T.G.'s application also constituted a petition for writ of habeas corpus necessitating a review of his continued commitment.
As noted by our supreme court, a hospitalization referee does not have jurisdiction "to hear and determine habeas corpus petitions." Id. at 9, n. 2. Thus, the hospitalization referee's order filed April 7, 2009, as it relates to B.T.G.'s continued commitment was beyond the referee's jurisdiction, and any delay in filing an appeal of such an order is inconsequential.[4] Because the district court tried the issue anew, we find the district court had subject matter jurisdiction to consider the issue of B.T.G.'s continued commitment as a habeas corpus proceeding and we have jurisdiction to consider the merits of B.T.G.'s instant appeal of that issue.

III. Civil Commitment.
An involuntary civil commitment proceeding is a special action that is triable to the court as an action at law. In re Oseing, 296 N.W.2d 797, 800-01 (Iowa 1980). Therefore, we review challenges to the sufficiency of the evidence for errors at law. See Iowa R.App. P. 6.907 (2009). The district court's findings of fact are binding upon this court if supported by substantial evidence. In re J.P., 574 N.W.2d 340, 342 (Iowa 1998). Evidence is substantial if a reasonable trier of fact could conclude the findings were established by clear and convincing evidence. Id. The continuation of an involuntary commitment requires the same impairment as ascribed to it by section 229.1(17), although reviewed in habeas corpus proceedings pursuant to section 229.37. B.A.A. v. Univ. of Iowa Hosps., 421 N.W.2d 118, 126 (Iowa 1988).
A person who has a "serious mental impairment" may be committed involuntarily. In determining whether a person has a serious mental impairment, the person must be found to have:

*797 (1) a mental illness, consequently (2) to lack "sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment" and (3) to be likely, if allowed to remain at liberty, to inflict physical injury on "the person's self or others," to inflict serious emotional injury on a designated class of persons, or be unable to satisfy the person's physical needs.
J.P., 574 N.W.2d at 342-43 (citations omitted); see also Iowa Code § 229.1(17). B.T.G. challenges the second and third elements.
The second element, judgmental capacity, "requires the State to prove that the person is unable because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not." In re Mohr, 383 N.W.2d 539, 541 (Iowa 1986). In the context of a review of continued commitment, we believe this element entails whether the person is unable to make a rational decision that his or her treatment continue or not.
Here, the district court found the testimony of Dr. Sieleni to be particularly persuasive as to this element. As the court stated:
[Dr. Sieleni] has known the Respondent in his previous two incarcerations and is the person who did the initial paperwork for the 2008 civil commitment which is still in effect. Dr. Sieleni has not been the treating physician for the Respondent during this incarceration but, as mental health director at Oakdale, he chairs staff meetings and has reviewed all of the Respondent's files. He is up to date on the facts and circumstances of the Respondent's commitment and placement. He testified that the Respondent has a long history of mental illness and before this incarceration was on Social Security Disability for this reason.... The symptoms of his illness are that the Respondent is out of control, is at a risk for self-harm, threatens to kill the staff and their children when not on his medications and also gets in fights with others at the facility...
Dr. Sieleni testified that the Respondent is seriously mentally impaired and in need of an acute level of care. It is his opinion that the Respondent cannot make reasonable decisions on his own treatment because of his mental illness.... The chief reason that the Respondent needs this level of care is that he has been noncompliant with his Lithium medication. Without this medication, his illness is not controlled. This is a chronic and persistent illness with ongoing psychosis with extreme mood swings from depression to threatening and violent behavior. The Respondent has only been compliant with the Lithium requirement since last weekend. The Court finds that this is not a pattern of compliance that indicates the Respondent will be compliant in the future because of his long history of noncompliance with Lithium.
B.T.G.'s primary caregiver at IMCC, nurse practitioner Jason Wilson, also testified regarding B.T.G.'s lack of judgmental capacity as evidenced by his noncompliance with his Lithium medication. As the court noted:
Nurse Practitioner Jason Wilson of the IMCC staff has been in contact with the Respondent on almost a daily basis since November 2008. He also testified that the Respondent was noncompliant with the Lithium medication until May 22, 2009, and has a history of noncompliance with medications or not taking medications correctly.
The record indicates that without his proper medications B.T.G. becomes out of control, threatening, and violent. Even when B.T.G. takes his medication properly, *798 his behavior is unpredictable. While at prison, he engaged in numerous fights with other inmates and officers, and spent most of his time in segregation. Currently, B.T.G. is placed in Unit Q in the mental health correctional area of IMCC. He has stated that his medications make him feel "psychotic" and therefore refuses to take them on a consistent basis. B.T.G.'s episodes require him to be kept in an individual cell for twenty-three hours per day with release from that cell for one hour per day for recreation and showers. Although B.T.G. has indicated he will comply with his medications, we cannot find his testimony persuasive given his lengthy history of noncompliance and resistance. Based on the evidence in the record, we conclude the second element of a serious mental impairment was satisfied.
The third element, dangerousness, involves "likely physical injury to oneself or others." J.P., 574 N.W.2d at 343. The threat the patient poses to himself or other must "be evidenced by a recent overt act, attempt or threat.'" Mohr, 383 N.W.2d at 543 (citation omitted). Overt acts include behavior such as threats to kill. In re Foster, 426 N.W.2d 374, 379 (Iowa 1988).
The record contains several examples of recent overt acts. On May 15, 2009, B.T.G. spit on a staff member and made racial slurs. On March 25, 2009, he threatened to harm the staff. On March 24, 2009, he threatened to kill the staff's children. On March 23, 2009, he threatened to hang the staff. In the beginning of May 2009, he was on suicide prevention. As the court noted, "The symptoms of his illness are that the Respondent is out of control, is at a risk for self-harm, threatens to kill the staff and their children when not on his medications and also gets in fights with others at the facility." Dr. Sieleni advised that "the Respondent is a danger to himself and others as evidenced by his threats against the staff and the fact that he has been striking out at the walls and door of his cell" and "is likely to injure himself or others if not under this present commitment." We conclude there is substantial evidence to establish that B.T.G. was likely to injure himself or others physically because of his mental illness.[5]
Because the second and third elements of "serious mental impairment" were satisfied, and the first element undisputed, we affirm the continued placement and commitment order under chapter 229.

IV. Ineffective Assistance of Counsel.
For the first time, on appeal, B.T.G. raises a claim of ineffective assistance of counsel. State v. Lucas, 323 N.W.2d 228, 232 (Iowa 1982) (claim of ineffective assistance may be brought for the first time on appeal without the preservation doctrine barring such claim). We conduct a de novo review of ineffective assistance of counsel claims. State v. Lyman, 776 N.W.2d 865, 877 (Iowa 2010). To establish a claim of ineffective assistance of counsel, a claimant must prove (1) counsel failed to perform an essential duty and (2) prejudice resulted to the extent it denied the claimant a fair trial. See id. A claimant's failure to prove either element by a preponderance of the evidence is fatal to a claim of ineffective assistance. State v. Polly, 657 N.W.2d 462, 465 (Iowa 2003).
B.T.G. alleges that he requested his counsel to subpoena several witnesses *799 to testify concerning his involvement in a fight that occurred at IMCC that prompted his move from the P Unit to the Q Unit. He contends his counsel breached a duty in failing to subpoena the witnesses, and that he was prejudiced by his attorney's failure because offering such evidence would have rebutted the dangerousness element in this case.
Specifically, B.T.G. argues the witnesses, if subpoenaed, would have testified that he did not smear feces on the wall of his cell during the fight at IMCC. He admits, however, that the witnesses knew that he spit on the wall. As B.T.G. stated, the witnesses "were responsible for cleaning my cell and they know I did not smear feces in my cell and only spit on the wall."
Upon our review, we find that counsel's decision not to subpoena the witnesses was within the range of normal competency. See Millam v. State, 745 N.W.2d 719, 721 (Iowa 2008). First, even if the witnesses would have testified that B.T.G. did not smear feces on the wall, their testimony would have inevitably delved into the specifics of the fight and the fact that B.T.G. spit on the wall. Second and more importantly, to establish that a person is a danger to self or others requires a showing of a "recent overt act or attempt or threat." J.P., 574 N.W.2d at 344. Here, the State introduced substantial evidence of overt acts by B.T.G. that occurred since his initial commitment, and that were much more recent than the alleged feces incident (including placement on suicide prevention; striking walls and the door of the cell; threats to kill staff members and their children; and a threat to hang staff members). Under these circumstances, it would have been pointless for B.T.G.'s counsel to attempt to focus the court's attention on an incident that occurred a year prior to these specific incidents of dangerousness exhibited by B.T.G. We therefore do not find that counsel breached an essential duty in failing to subpoena the witnesses.
Further, even if the witnesses had been subpoenaed to testify, there is not a reasonable probability that the outcome would have been different. See State v. Maxwell, 743 N.W.2d 185, 196 (Iowa 2008) (noting that to establish prejudice, a claimant must prove a reasonable probability that, but for his counsel's failure, the result of the proceeding would have been different); Ledezma v. State, 626 N.W.2d 134, 143 (Iowa 2001) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984)) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). The district court does not mention the feces incident in its May 28, 2009 ruling confirming B.T.G.'s continued placement and commitment. More importantly, the district court relied on ample additional evidence of B.T.G.'s risk for self-harm and harm of others in reaching its conclusion regarding B.T.G.'s dangerousness. Thus, our confidence in the outcome is not undermined, notwithstanding any error by counsel. See Millam, 745 N.W.2d at 722; Ledezma, 626 N.W.2d at 143.

V. Conclusion.
We conclude B.T.G.'s application for a placement review hearing was not timely filed pursuant to Iowa Code section 229.21(3)(d), and as a result, the district court lacked subject matter jurisdiction to consider the merits of the appeal. However, we find that the district court had subject matter jurisdiction to consider the issue of B.T.G.'s continued commitment as a habeas corpus proceeding, and we therefore have jurisdiction to consider the merits of B.T.G.'s instant appeal of that issue. Upon our review, we affirm the court's continued commitment order of B.T.G. We further deny any relief on B.T.G.'s claim *800 for ineffective assistance of counsel and the appeal of his placement order.
AFFIRMED.
NOTES
[1] B.T.G. has a history of prior felony offenses.
[2] B.T.G.'s mental illnesses are not in dispute.
[3] The State contends the principle espoused in Halverson should not apply when the application is filed by counsel. However, our supreme court has looked to substance over form even where the application has been filed by counsel. See Klinge, 725 N.W.2d at 17; Iowa Elec. Light & Power Co. v. Lagle, 430 N.W.2d 393, 395 (1988).
[4] Judicial officers would be well advised to clarify at the outset of any hearing the type of review sought by the respondent.
[5] B.T.G. is permitted some liberty one hour per day, although we acknowledge that he is incarcerated in his cell twenty-three hours per day. The requirement that the person be likely to injure himself or others physically if allowed to remain "at liberty" without treatment does not require that the person have the benefit of liberty twenty-four hours per day. See Iowa Code § 229.1(16) (2007) (current version at § 229.1(17) (2009)).