# IN THE COURT OF APPEALS OF IOWA

No. 19-2044
Filed November 30, 2020

**IN THE MATTER OF R.B.,**
**Alleged to Be Seriously Mentally Impaired,**

**R.B.,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Marshall County, James A. McGlynn, Judge.

R.B. appeals the district court's refusal of R.B.'s petition for a writ of habeas corpus. **AFFIRMED.**

John L. Dirks of Dirks Law Firm, Ames, for appellant.

Thomas J. Miller, Attorney General, and Gretchen Kraemer, Special Assistant Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**VAITHESWARAN, Presiding Judge.**

R.B. was found to have a "serious mental impairment." *See* Iowa Code § 229.1(20) (2019). He was placed at the Iowa Veterans Home in Marshalltown, Iowa. The court of appeals affirmed the placement in *In re R.B.*, No. 15-0823, 2015 WL 6507836, at *1 (Iowa Ct. App. Oct. 28, 2015).

Approximately four years after our opinion was filed, R.B. petitioned for a writ of habeas corpus. *See* Iowa Code § 229.37 ("All persons confined as seriously mentally impaired shall be entitled to the benefit of the writ of habeas corpus, and the question of serious mental impairment shall be decided at the hearing."). Following an evidentiary hearing, the district court "refused" the writ. R.B. appealed.

"Serious mental impairment" describes "the condition of a person with mental illness" who, "because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria":

> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
> c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.
> d. Has a history of lack of compliance with treatment and any of the following apply:
>> (1) Lack of compliance has been a significant factor in the need for emergency hospitalization.
>> (2) Lack of compliance has resulted in one or more acts of serious physical injury to the person's self or others or an attempt to physically injure the person's self or others.

*Id.* § 229.1(20). "The continuation of an involuntary commitment requires the same impairment as ascribed to it by section 229.1[(20)], although reviewed in habeas corpus proceedings pursuant to section 229.37." *In re B.T.G.*, 784 N.W.2d 792, 796 (Iowa Ct. App. 2010) (citation omitted).

R.B. focuses on subsection 229.1(20)(a). He argues the court improperly "concluded he is likely to injure himself or others if released from the civil commitment." We review "the propriety of continued involuntary commitment" for errors of law. *B.A.A. v. Univ. of Iowa Hosps.*, 421 N.W.2d 118, 120 (Iowa 1988). "The district court's findings of fact are binding upon this court if supported by substantial evidence." *B.T.G.*, 784 N.W.2d at 796.

The district court made the following pertinent findings: "First, the respondent continues to have a multi-faceted mental health diagnosis which requires structure and medication to keep him safe. Second, the respondent's traumatic brain injuries cannot be treated or reversed. Third, the respondent has recently demonstrated that he is unable to control his impulse to consume alcohol." The court summarized the testimony of R.B.'s psychiatrist, citing R.B.'s mental-health diagnoses, "history of substance abuse and alcoholism," history "of traumatic brain injuries," and "a serious fall after drinking" that required a "lengthy hospitalization and treatment." The court found the psychiatrist's testimony "convincing." The court next described an episode that occurred during a furlough with R.B.'s family, finding that, "[a]t some point during the furlough, [R.B.] was left alone . . . for a period of about one-half hour;" and, "[d]uring that period, [he] consumed an estimated 11 beers." The court determined:

[R.B.'s] history of falling, the emergency treatment and lengthy hospitalization resulting from his head injuries and the lack of impulse control shown by the failed visit with [his] family show that he is likely to physically injure himself if allowed to remain at liberty without treatment. His history of lack of compliance with treatment has resulted in the need for emergency hospitalization and resulted in one or more acts of serious physical injury to [himself].

The court's findings are supported by substantial evidence. Specifically, the psychiatrist described R.B.'s bouts of drinking during two furloughs, then opined, "He does show a definite loss of impulse control when it comes to his drinking." He spoke to the dangers of R.B.'s alcohol use as follows:

I think it's dangerous on many levels. It may exacerbate his tendency to be aggressive or violent, which I think stems mainly from his antisocial personality disorder, as well as his brain injury which reduces his ability to control impulses. I think alcohol would make those behaviors even worse. Also I think it could cause further cognitive impairment or cognitive or brain damage for him if he continued to drink, and I think that alcohol would put him at risk for falls which could result in additional brain damage if he struck his head.

The psychiatrist was unpersuaded that R.B.'s willingness to take Antabuse would control his drinking. He testified, "There are many people who have this lack of impulse control who will just simply drink and experience the consequences of Antabuse, but still just push through that and continue to drink." *See In re B.B.*, No. 04-1886, 2005 WL 1225959, at *3 (Iowa Ct. App. May 25, 2005) (finding B.B. was a danger to himself based on a recent fall due to alcohol dependency and his continued neglect of self-care). As for R.B.'s compliance with his existing medication regimen, the psychiatrist testified:

[R.B] has been compliant with his medication in this setting. My concern is that particularly if he started drinking, that he would very quickly stop the medication. I don't think he's opposed to taking it, but I think he would not have that structure of someone giving him

the medication and monitoring it. And without that, I think it would become unimportant to him and he would very quickly stop doing it.

He opined that, without one of the medications, R.B.'s "psychotic symptoms, his delusions and hallucinations would be worse" and, without two others, "his aggression could become worse." The delusions, the psychiatrist stated, might cause R.B. to "journey out to California," a prediction grounded in R.B.'s testimony that he wished to do just that, notwithstanding his lack of a valid driver's license. Notably, R.B. did not attend follow-up visits with the psychiatrist even in the supervised VA setting, lending credence to the psychiatrist's concern about his ability to independently manage his medication regimen. Because the district court's findings are supported by substantial evidence, we conclude the court did not err in ordering R.B.'s continued placement.

In reaching this conclusion, we recognize that other record evidence supports R.B.'s assertion that he did not pose a danger to himself. For example, the psychiatrist conceded R.B. had freedom to come and go into town and he remained sober during those outings.

We also recognize the State was obligated to prove R.B. committed a recent overt act establishing dangerousness and the family furlough during which R.B. consumed eleven beers in thirty minutes occurred close to a year before the habeas corpus hearing. *See In re L.H.*, 890 N.W.2d 333, 341 (Iowa Ct. App. 2016) (finding the "recent overt act" requirement was not satisfied where "the last overt act occurred . . . nearly one year before [the] placement review"). But the record of dangerousness in *L.H.* was thin. The "State offered no testimony or other evidence at the perfunctory [initial] hearing" and, on appeal to the district court,

which held a "de novo trial," the State apparently declined to call the treating psychiatrist as a witness. *See id.* at 336–37, 340. Here, in contrast, the treating psychiatrist thoroughly explained his reasons for believing R.B. posed a danger to himself. *See In re J.R.*, No. 17-0449, 2018 WL 2084819, at *2 (Iowa Ct. App. May 2, 2018) (citing testimony of same psychiatrist and stating "[a]lthough [certain] behaviors are not currently occurring and have not occurred in some time, the evidence shows they are likely to occur again if [the] commitment was not continued").

We affirm the district court's denial of R.B.'s petition for writ of habeas corpus.

**AFFIRMED.**