**IN THE COURT OF APPEALS OF IOWA**

No. 20-1154
Filed April 28, 2021

**IN THE MATTER OF S.G.,**
**Alleged to be Seriously Mentally Impaired,**

**S.G., Respondent,**
    Appellant.
_____

    Appeal from the Iowa District Court for Des Moines County, Mark Kruse, Judge.

    S.G. appeals from the district court's order finding her to be seriously mentally impaired and requiring placement at a residential care facility. **AFFIRMED.**

    Brent Ruther of Aspelmeier, Fisch, Power, Engberg & Helling, PLC, Burlington, for appellant.

    Thomas J. Miller, Attorney General, and Gretchen Kraemer, Assistant Attorney General, for appellee State.

    Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**VAITHESWARAN, Presiding Judge.**

S.G. appeals an order finding her seriously mentally impaired and requiring continuing full-time hospitalization. She seeks release from inpatient hospitalization and re-implementation of an order for outpatient treatment.

Iowa Code section 229.1(20) (2020) defines "serious mental impairment" as follows:

> 20. "Seriously mentally impaired" or "serious mental impairment" describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:
>> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
>> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
>> c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.
>> d. Has a history of lack of compliance with treatment and any of the following apply:
>>> (1) Lack of compliance has been a significant factor in the need for emergency hospitalization.
>>> (2) Lack of compliance has resulted in one or more acts causing serious physical injury to the person's self or others or an attempt to physically injure the person's self or others.[1]

S.G. concedes she has a mental illness. She contends "the evidence does not meet the clear and convincing standard required to show [she] lacks sufficient

---

[1] Subsection (d) was amended, effective July 1, 2020, as follows: "(2) Lack of compliance has resulted in one or more acts ~~of~~ causing serious physical injury to the person's self or others or an attempt to physically injure the person's self or others." 2020 Iowa Acts ch. 1063, § 85. The amendment applies to this case.

judgment to make responsible decisions with respect to her own care and treatment" and, given her "nearly immediate stabilization" following her hospitalization, "the concern that [her] medication non-compliance would create a danger to herself" was "not sufficient."

We review "the propriety of continued involuntary commitment" for errors of law. *B.A.A. v. Univ. of Iowa Hosps.*, 421 N.W.2d 118, 120 (Iowa 1988). "The district court's findings of fact are binding upon this court if supported by substantial evidence." *In re B.T.G.*, 784 N.W.2d 792, 796 (Iowa Ct. App. 2010).

Following an evidentiary hearing, the district court made verbal findings from the bench that S.G. had a "history of noncompliance with" her "medication" regimen dating back to "2015." Most recently, she was found "wandering around in a field" and was "taken to the hospital." She ran out "naked" and had "to be taken back inside" with "some force." The court characterized her behaviors as "the same thing over and over." The court found "she was given multiple opportunities to try and address her behaviors, try and correct it. She didn't do it." The court further found S.G. not credible in pinning the blame for her noncompliance on others.

In a subsequent written order, the court found S.G. did "not comply with medication and the rules of daily living"; had "poor insight"; "was dismissed from" a previous facility "due to non-compliance with rules and medication"; and "was found in a field and taken to the hospital." The court further found that, "[w]hile at the hospital, she was verbally abusive and combative and acknowledged not taking medication at the ER"; "[s]he left the emergency room naked and went into a pond covered in feces and had to be removed from the pond with some force";

and "[h]er history has numerous instances of failure to comply with medication that was prescribed." The court continued: "The evidence shows [S.G.] is completely unable to function on an independent basis without a huge risk of engaging in behavior that could lead to serious consequences for [herself]. This includes an inability to see to her basic needs." Substantial evidence supports the court's findings.

S.G. was found to be seriously mentally impaired in 2015, and she was committed to inpatient treatment. She was subsequently ordered to receive outpatient treatment. In late July 2020, a physician reported that her condition had "deteriorated," and she "need[ed] [a] higher level of care at this time." The physician noted that S.G. was "failing or refusing to submit to treatment as ordered by the Court," "not taking medications on a fairly regular basis," and "[n]ot abiding by the rules of her group home and nearing getting evicted." Less than a month later, the physician stated she was "[e]victed" from the home "due to threatening behavior," was "[n]ot taking oral medications," and "need[ed] to be placed in" a residential care facility "level of care."

A psychiatrist reported that after S.G. was found in a cornfield and brought to the hospital, she "was manic and became agitated." She recommended S.G. "go forward with inpatient behavioral health treatment and that her outpatient mental health committal be switch[ed] to an inpatient court committal for her safety as she does present to be a danger to herself and others at this time." In a filing supporting the State's request for inpatient hospitalization, the psychiatrist stated S.G. was likely to physically injure herself based on "overt acts" of "bizarre behavior, self neglect, [and] med noncompliance."

At the evidentiary hearing, the psychiatrist opined that S.G. "exhibit[ed] an inability to maintain a functional status at a lower level of care, including maintaining compliance with medications and activities of daily living." She stated S.G. "had poor insight or judgment into her mental illness." While she opined S.G. was not "suicidal or homicidal," she stated her "pattern and behavior, like such as what happened prior to [her] admission" placed "her at a danger to herself." She agreed her "medication non-compliance" and "non-compliance with treatment" required inpatient treatment.

The psychiatrist's testimony was corroborated by the director of the outpatient group home where S.G. had been staying. She testified S.G. "just kind of spiraled down." The director expressed concern about S.G.'s medication compliance, noting that toward the end of her stay, she "was refusing meds" and "throwing up her pills." She also struggled with "daily living tasks."

Because substantial evidence supports the district court's findings, the court did not err in concluding S.G. lacked judgmental capacity. *See In re L.H.*, 890 N.W.2d 333, 340 (Iowa Ct. App. 2016) ("To demonstrate lack of judgmental capacity in a review of a continuing commitment, the State must prove 'the person is unable because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not.'" (quoting *B.T.G.*, 784 N.W.2d at 797)). The court also did not err in concluding S.G. was "likely to physically injure" herself "if allowed to remain at liberty without treatment." Iowa Code § 229.1(20)(a).

We affirm the continuing inpatient hospitalization order.

**AFFIRMED.**