# IN THE COURT OF APPEALS OF IOWA

No. 24-0875
Filed July 23, 2025


**TREVON JOHN LUCAS,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Clinton County, Patrick A. McElyea,

Judge.


        An applicant appeals the denial of his application for postconviction relief.

**AFFIRMED**.


        Ronald W. Kepford, Winterset, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee State.


        Considered without oral argument by Greer, P.J., and Badding and

Chicchelly, JJ.

**GREER, Presiding Judge.**

A jury found Trevon Lucas guilty of three counts of sexual abuse stemming from his actions at a house party in February 2020. After an unsuccessful direct appeal, Lucas applied for postconviction relief (PCR) alleging that his trial counsel's efforts constituted ineffective assistance of counsel and he is actually innocent. After his PCR application was denied by the district court, he raises the same claims on appeal.

We conclude trial counsel's strategic decisions to not call certain witnesses at trial did not amount to ineffective assistance of counsel and that Lucas did not establish clear proof of his actual innocence through his PCR witness when the constellation of trial testimony related to his contact with the child victim is considered.

## I. Background Facts and Proceedings.

Lucas's charges stem from the events of a house party. A panel of our court, on direct appeal, described the pertinent underlying facts:

> In February 2020, thirteen-year-old Zora[1] and her friends, Cruz and Anton, were invited to a house party. Against her initial instinct, Zora's great-grandmother gave Zora and the boys permission to attend. But as it turns out, her reluctance would prove warranted.
> Seventeen-year-old Lucas hosted the party in a now-abandoned house where he used to live. At the party, Zora and her friends experimented with alcohol and marijuana. But the substances affected Zora more than they did the boys. And soon she was struggling to stand, slurred her speech, and became incoherent.

---

[1] On direct appeal, our court used pseudonyms for minors in the recitation of the underlying facts. *See State v. Lucas*, No. 21-0056, 2021 WL 5918047, at *1 n.2 (Iowa Ct. App. Dec. 15, 2021). We maintain the pseudonyms in our recitation of the facts and when referring to the child victim but because the witness at issue, Zavius Washington, was an adult at the time of the PCR trial, we use his real name.

Although Cruz was concerned for Zora, he and Anton left the party briefly to pick up some non-alcoholic beverages at a nearby store. When they returned, the boys found Zora in a daze, trying to take off her pants. Panicked, Cruz placed a video call to Zora's cousin, Tessa. While Cruz was on the phone, he saw another party guest, Sabrina, start "licking" Zora's vagina. Cruz pushed Sabrina away from Zora. But soon after interrupting that contact, Cruz saw Lucas insert his finger inside Zora's vagina.

As this was happening, Zora's great-grandmother and sister arrived to pick up Zora and her friends. But no one would let them in the house or tell them where Zora and her friends were. It was only after Zora's sister called police that someone finally let them in. Once inside, they found Zora sprawled on the floor, incoherent, with her arms flailing. Soon after, Tessa and Tessa's father arrived on the scene. He carried Zora to a waiting ambulance which took her to the emergency room. After her condition stabilized, Zora was transferred to another medical center where she underwent a sexual assault examination and the nurse collected her clothing.

*Lucas*, 2021 WL 5918047, at *1 (footnotes omitted). The jury found Lucas guilty of three counts of sex abuse in the third degree, and the district court merged the convictions for the purpose of sentencing. On direct appeal, Lucas argued "the State failed to show the commission of a sex act or that he was the perpetrator," but we affirmed his convictions. *Id.*

On March 9, 2022, Lucas timely applied for PCR pursuant to Iowa Code section 822.3 (2022). After twice amending his application, Lucas claimed his trial counsel provided ineffective assistance and asserted his actual innocence. The PCR trial was held on May 1, 2024, and the district court denied Lucas's PCR application on May 23. Lucas appeals.

## II. Standard of Review.

We generally review PCR proceedings for correction of errors at law. *Brooks v. State*, 975 N.W.2d 444, 445 (Iowa Ct. App. 2022). However, "[w]e review de novo PCR claims of ineffective assistance of counsel." *Trane v. State*, 16

N.W.3d 683, 692 (Iowa 2025). And "[t]o the extent [Lucas's] claim of actual innocence raises constitutional questions, our review is de novo." *Dewberry v. State*, 941 N.W.2d 1, 4 (Iowa 2019).

### III. Discussion.

Lucas brings two claims—trial counsel's representation constituted ineffective assistance of counsel that prejudiced him and the PCR trial evidence shows he is actually and factually innocent. We address both claims in turn.

### A. Ineffective Assistance of Counsel.

Lucas points to trial counsel's investigation and decision to not call a witness that later favorably testified at the PCR trial on Lucas's behalf. He asserts trial counsel started the investigation late, had her investigator do critical interviews instead of speaking directly with potential witnesses, and then chose not to call an essential witness. "To prevail on a claim of ineffective assistance of counsel, the applicant must demonstrate both ineffective assistance and prejudice." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001); *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). "However, both elements do not always need to be addressed. If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma*, 626 N.W.2d at 142.

To show ineffective assistance, the applicant must "demonstrate the attorney performed below the standard demanded of a reasonably competent attorney." *Id.* "[W]e scrutinize each claim in light of the totality of the circumstances. In the end, the inquiry is transformed into an individualized fact-based analysis." *Id.* (internal citation omitted). "Miscalculated trial strategies and

mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Id.* at 143. "We presume the attorney performed competently, and the applicant must present 'an affirmative factual basis establishing inadequate representation.'" *Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008) (citation omitted). But "a decision by counsel based upon tactical judgment does not completely immunize the decision from an ineffective assistance challenge." *Ledezma*, 626 N.W.2d at 143. "[S]trategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment." *Id.*

"Once the applicant proves ineffective assistance, it must also be shown that the error caused prejudice." *Id.* To show prejudice, the applicant "must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

Examining Lucas's contentions about the investigation, interview process, and decision to not call Zavius Washington, another partygoer, to testify, we look to the testimony from the PCR trial. Lucas's trial counsel articulated her reasons for how the investigation was conducted and for not calling Washington at the underlying criminal trial.[2] Trial counsel testified at the PCR trial that her public

---

[2] The original trial counsel developed a medical issue and the case was reassigned to another public defender, who took the case "from the middle of the case" through trial.

defender office utilized the services of an experienced investigator to "have him reach out to potential witnesses . . . [and] serve subpoenas to those people. And the reason that this was done was to essentially make sure that if we needed to, we could use [the investigator] to testify . . . based upon potential interactions with witnesses in a case." At the PCR trial, Lucas's trial counsel utilized the extensive notes of the investigator to describe the pre-trial workup. The investigator contacted several witnesses identified by Lucas.[3]

As the trial drew near, trial counsel asserted that cooperation with Washington "was dependent on the day" and Washington's discussion with the investigator yielded inconsistent statements, including a comment that Washington saw Lucas pull Zora away and put her in a bedroom, which raised concerns about the usefulness of Washington's testimony. There were also concerns about whether Washington would even show up for trial, which as it turned out he did not, even though trial counsel indicated that the investigator provided a subpoena to Washington, although he denied ever being subpoenaed. As a result, trial counsel asserted she made a strategic choice not to call Washington to testify as she was wary of Washington's testimony:

> [Washington] had also been inconsistent as to whether or not he was with [Lucas] 100 percent of the time, and that was one of the issues that I wanted to make sure our investigator specifically explored because it was a house party and people were in and out of different rooms and if [Washington] wasn't with . . . Lucas 100 percent of the time, [the State's] potential cross-examination could have been very damaging to our case.

---

[3] Initially in the PCR proceeding, Lucas asserted trial counsel provided ineffective assistance by not calling two other witnesses who were at the party, but he abandoned that claim based on how their depositions in the PCR proceeding went.

Trial counsel described Washington's demeanor and how his willingness to communicate changed as trial neared:

> [Washington's and other witnesses' stories] were never wholly consistent.  And as we got closer to trial, those inconsistencies really started coming to light.  And as we got closer to trial the demeanor of those witnesses and . . . the boys' mother . . . demeanor changed in which people were getting more cagey, unwilling to communicate directly with the investigator which is not uncommon, but does always cause concern because you can never guarantee the results.

Regardless, Lucas's trial counsel reported she was prepared for Washington to testify and, if needed, she would have prepped him to testify the day before he would be called to the witness stand.

But as sometimes happens, the dynamics of the trial changed.  Sabrina, the State's witness, surprised the prosecutor and testified Lucas did not have sexual contact with Zora.[4]  According to trial counsel, Sabrina "was unequivocal in her testimony."  By all accounts, the State did not anticipate that testimony, as the minutes of testimony stated, "[Sabrina] initially denied having her mouth on [Zora's] vagina and stated that [Lucas] was the one 'fingering' [Zora] on the box spring."  According to trial counsel, "[E]ssentially[,] [Sabrina] was going to be testifying against . . . Lucas, but the nature of her testimony was not that."  After Sabrina's testimony at the criminal trial, trial counsel recalled speaking with Lucas:

> I don't know that I would characterize it as a conversation, but I certainly advised him that this was such good testimony for us, and subsequently the trial strategy was to no longer call any of the child witnesses because should they that bring up any testimony that created inconsistencies that conflict[ed] with [Sabrina's] testimony it could be potentially much worse where [Sabrina's] testimony was so helpful because if who should have been the codefendant says ["]no, he didn't do anything.  I did everything.  He had no involvement,["]

---

[4] Sabrina, a minor, was also charged for committing a sex act on Zora, but her case was resolved in juvenile court by guilty plea.

there was no benefit that could have [outweighed] the potential consequences of calling those additional witnesses.

Lucas largely corroborated this discussion, testifying at the PCR trial:

And when we was at trial, she pulled me to the side and told me that the case was going good and basically we didn't need my witnesses because how the defense attorney wasn't basically all there, and since I had my codefendant tell the truth on her behalf, she was telling me that she did not need my witnesses because there was enough there.

As for the investigation leading up to trial and the decision to not call Washington as a witness, the investigator made contact with Washington more than two months before trial. Lucas argues there is no evidence of formal service of the subpoena on Washington and points to Washington's testimony at the PCR trial he was not subpoenaed. But failing to subpoena Washington is not necessarily ineffective assistance of counsel. *See In re B.T.G.*, 784 N.W.2d 792, 799 (Iowa Ct. App. 2010) ("Upon our review, we find that counsel's decision not to subpoena the witnesses was within the range of normal competency."). Even if we assume that a subpoena was never served on Washington, which contradicts trial counsel's testimony, failing to subpoena him is not necessarily ineffective assistance of counsel.

Similarly, trial counsel was under no professional obligation to personally interview the witness. *See Harris v. State*, No. 20-0064, 2021 WL 389351, at *1 (Iowa Ct. App. Feb. 3, 2021) (concluding counsel did not provide ineffective assistance when counsel's investigator interviewed all of the witnesses and counsel did not depose them). Trial counsel explained during her PCR trial testimony that she "always" relied on an investigator to gather information, "[a]nd one of the things that was regularly utilized was essentially a Google drive

document where he would update notes. Occasionally there would be situations where things were really pressing where he would give you a phone call instead." Deciding not to personally interview a witness is a strategic choice, one dependent on available resources and time. Here, trial attorney gathered facts of the case through an investigator; the choice to do so does not constitute ineffective assistance of counsel. This was a reasonable investigatory strategy. *See id.* at *2 ("To provide effective assistance of counsel during the investigatory stage, counsel is required to conduct a reasonable investigation and to make reasonable decisions regarding discovery. The reasonableness of counsel's investigation must be judged in relationship to the particular underlying circumstances." (cleaned up)).

On our review, PCR testimony from Lucas and his trial counsel show the decision not to call Washington to the stand at the criminal trial was a strategic one. The investigation format did not inhibit the defense; it informed trial counsel about the risks of the potential testimony. And, when Sabrina firmly testified Lucas did not perform sex acts on Zora, the risks involved with Washington's behavior and possible inconsistent versions, rife with credibility concerns, could have impeded the trial theory rather than aid it. Trial counsel kept Lucas apprised of the status of his case, communicated during trial, and used her legal acumen to weigh the benefits against the detriments of calling an inconsistent witness to the stand. The decision not to call Washington involved an educated and calculated choice to minimize inconsistent testimony. *See Ledezma*, 626 N.W.2d at 143 ("[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were

a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment.").

On our review, we conclude trial counsel performed competently. Trial counsel made reasonable strategic decisions. Because Lucas failed to show his trial counsel acted below the standard of a reasonably competent attorney, his claim of ineffective assistance fails. *See Strickland*, 466 U.S. at 697; *Ledezma*, 626 N.W.2d at 142. We do not address the prejudice prong. *See id.*

## B. Actual Innocence.

"For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant . . . in light of all the evidence, including the newly discovered evidence." *Schmidt v. State*, 909 N.W.2d 778, 797 (Iowa 2018). "[A]n applicant bringing a freestanding claim of actual innocence is claiming he or she is factually and actually innocent, despite a fair, constitutionally compliant trial . . . free of constitutional defects." *Id.*

At the PCR trial, Washington testified that Lucas could not have committed a sex act on Zora because Lucas, Washington's brother, and Washington were together playing video games in an upstairs room when the abuse happened. But even with this recent testimony, Lucas did not meet the "demanding actual-innocence standard" to prove the validity of that claim. *Dewberry*, 941 N.W.2d at 5 (quoting *Schmidt*, 909 N.W.2d at 793). That competing testimony is a tough sell given the fact that an eyewitness to Lucas's actions testified that Lucas sexually assaulted Zora and that there was evidence Lucas and Washington were not

always together. As to the question of whether Lucas was ever alone with Zora, his trial attorney testified:

> [T]here were statements that he was never alone, but there had been statements that he was with her, and then there were additional child witnesses who were noticed in the Minutes [of Testimony] and in the police reports who had varying accounts as well. So there was concern about potential inconsistent statements coming up at trial.

And while Washington maintained that he was with Lucas the entire night—never leaving his side—in his PCR testimony, Washington said he did leave Lucas to go to a different area of the house downstairs. And at trial, Lucas said he was at the bedroom door and saw Zora naked, watching Sabrina perform a sex act on Zora, which conflicted with what Washington said about Lucas's whereabouts.

Given the amalgamation of inconsistent evidence, which the factfinder must weigh to make a credibility finding, there is not clear and convincing evidence that no reasonable jury could convict Lucas. *See Schmidt*, 909 N.W.2d at 797; *see, e.g.*, *Cone v. State*, No. 23-1177, 2025 WL 547645, at *3 (Iowa Ct. App. Feb. 19, 2025) ("Cone's actual innocence claim relates to alleged 'inconsistencies in [the victim]'s report of sexual abuse, which is consistent with [Cone]'s denial of sexual abuse,' as well as his contention that he was not alone with the victim in his home at any time. We find that this argument does not rise to the clear proof required to sustain an actual innocence claim under *Schmidt*." (alterations in original)). Lucas failed to establish his actual innocence claim.

## IV. Conclusion.

We affirm the denial of the PCR application.

**AFFIRMED.**