# IN THE COURT OF APPEALS OF IOWA

No. 25-0450
Filed October 1, 2025

IN THE MATTER OF S.R.,
ALLEGED TO BE SERIOUSLY MENTALLY IMPAIRED,

S.R.,
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Clay County, Shawna L. Ditsworth, Judge.

A respondent appeals a mental-health civil commitment order. **AFFIRMED.**

Debra S. De Jong, Orange City, for appellant.

Brenna Bird, Attorney General, and Sarah Jennings, Assistant Attorney General, for appellee State.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**BULLER, Judge.**

S.R. appeals from an order committing her for inpatient mental-health treatment pursuant to Iowa Code chapter 229 (2025).  Finding the statutory elements supported by substantial evidence and that S.R. received effective assistance of counsel, we affirm.

**Background Facts and Proceedings.**  S.R. called police reporting her own suicidal and homicidal thoughts and claiming she had sexually assaulted herself.  Officers found her "in an agitated, hyperverbal state, with flight of ideas [and] paranoia," and took her to the emergency department of a regional hospital.  Staff there similarly observed her to be "agitated and disorganized, hyperkinetic, [and] delusional."  A physician medicated her for agitation, placed her on a forty-eight-hour hold, and admitted her to the inpatient psychiatric unit.

After admission, S.R. was still "displaying pressured speech, flight of ideas, [and] labile affect," and she was again medicated for agitation.  The physician who evaluated her the following morning also opined that she "displayed symptoms of mania."  She told the physician that she was suicidal and "close to" killing herself or her former employer's wife.

For the first several days, it was difficult to even converse with S.R., given her state—"severely manic with psychotic features"—and that she was refusing medications.  For example, she said she communicated in "energy" rather than words, her devices were hacked, and she was being followed.  She also displayed some "hypersexual thought process," including comments about pedophilia.  After the physician sought commitment, S.R. "completely shut down" and refused to

cooperate with treatment or any medication regime, while also "continuing to be significantly paranoid and delusional and requiring treatment on the inpatient unit."

As of the commitment hearing, S.R. was still refusing medication and treatment. The physician provisionally diagnosed her with "schizoaffective disorder, bipolar type," explaining that "in general, she experiences underlying symptoms of psychosis and at times can go into a—a mood disorder of mania or depression." He opined that she has "significantly impaired insight" and was a danger to herself or others if not committed for inpatient treatment. And he described conversations with S.R.'s family members and a friend, reporting they were concerned about her mental health and generally supported the recommendation for medication and inpatient hospitalization.

S.R. testified at the hearing and broadly disputed the physician's version of events. She described her mental-health conditions as relating to autism and post-traumatic stress rather than schizoaffective disorder or mania. And she denied suicidal or homicidal ideation.

The district court found the physician's testimony "credible" and accepted his provisional diagnosis. The court also credited the written reports and affidavit in support of commitment, finding S.R. was not capable of making responsible decisions and was a danger to herself or others. And the court ordered S.R.'s

continued commitment. S.R. appeals, challenging sufficiency of the evidence and counsel's performance at the commitment hearing.[1]

**Sufficiency of the Evidence.** We review sufficiency of the evidence in an involuntary civil commitment for mental health treatment for correction of errors at law. *B.B.*, 826 N.W.2d at 428. We affirm commitment if the petitioner satisfied its burden by clear and convincing evidence. *Id.*

In reviewing chapter 229 actions, our courts generally describe three elements: (1) a mental illness, (2) impaired judgment as to treatment, and (3) a danger posed to self or others as evidenced by a recent overt act. *See In re V.H.*, 996 N.W.2d 530, 543 (Iowa 2023). The danger posed is predictive in nature but must "be evidenced by a recent overt act, attempt, or threat." *Id.* (cleaned up). "The overt act must indicate past aggressive behavior or threats that manifest the probable commission of a dangerous act by the respondent that is likely to result in physical injury." *Id.* at 544 (cleaned up).

On appeal, S.R. does not really contest that she has a mental illness—she just argues she was diagnosed with the wrong label. Based on the physician's report and testimony, which the district court credited, we have little trouble concluding this element was satisfied. *See In re S.S.*, No. 15-0494, 2015 WL 6508809, at *4 (Iowa Ct. App. Oct. 28, 2015) (finding a physician's report with a diagnosis sufficient for this element). As for the second element—impaired

---

[1] It appears the respondent was subsequently discharged from commitment. But neither party asks us to dismiss this appeal as moot, and the supreme court has recognized a presumption that the collateral effects of involuntary civil commitment usually justify deciding an otherwise moot appeal. *See In re B.B.*, 826 N.W.2d 425, 432 (Iowa 2013).

judgment as to treatment—S.R.'s paranoia, delusions, mania, psychosis, refusal to communicate with treatment providers, and refusal of treatment all support the district court's conclusion this element was met, and we agree on our review.

We single out the last element—dangerousness—for a little more analysis. As we understand it, S.R. primarily challenges the recency of any danger she poses, focusing on the claims she had suicidal and homicidal ideation. Although the record is not a model of clarity, the physician testified that "when [S.R.] came in she did say that she was suicidal," the application described this ideation as "recent," and the physician report refers to "recent" suicidal ideation and homicidal ideation "in state of mania without insight." The recency of these concerns is corroborated by the physician's summary of S.R.'s family's and friend's concerns. Last, the record indicates S.R. herself reported to police that she had "suicidal" and "homicidal" thoughts and said that she had sexually assaulted or abused herself. In reviewing the totality of this evidence, we conclude S.R.'s commitment was supported by substantial evidence.

**Ineffective Assistance.** We generally review ineffective-assistance claims de novo. *In re B.T.G.*, 784 N.W.2d 792, 798 (Iowa Ct. App. 2010). As we have in the past when reviewing civil commitments, we assume without deciding there is a right to effective counsel in civil commitment proceedings under chapter 229. *See In re C.J.*, No. 24-0244, 2024 WL 3518284, at *2 (Iowa Ct. App. July 24, 2024); *In re J.H.*, No. 12-1133, 2013 WL 1760183, at *3 (Iowa Ct. App. Apr. 24, 2013); *see also* Iowa Code § 229.8(1) (providing the respondent a right to a court-appointed attorney). To succeed on such a challenge, S.R. must prove that her counsel breached or failed to perform an essential duty and that she was

prejudiced to the extent she was denied a fair trial. *See B.T.G.*, 784 N.W.2d at 798; *cf. generally Strickland v. Washington*, 466 U.S. 668, 680–82 (1984).

The main thrust of S.R.'s claim is that her trial attorney should have requested a separate examination by a second physician. But, as part of the burden for proving counsel ineffective for not calling a witness or putting on evidence, the claiming party must establish what the witness would have testified or the evidence would have shown. *See Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994); *Nichol v. State*, 309 N.W.2d 468, 470 (Iowa 1981) ("[C]omplaints about failure to call witnesses should be accompanied by a showing their testimony would have been beneficial."). S.R. has not identified a specific second-opinion physician, let alone that this hypothetical physician's testimony would have been so favorable it was reasonably likely to change the outcome or that the absence of a second opinion denied her a fair trial. And even if S.R. proved to us what a second opinion might disclose, we are reluctant to second-guess attorneys' trial tactics about witness selection. *State v. Polly*, 657 N.W.2d 462, 468 (Iowa 2003) ("Generally, the decision not to call a particular witness . . . to testify implicates a reasonable tactical decision.").

S.R. also suggests that trial counsel should have sought a continuance to secure a second examination. We discern no breach of an essential duty. And S.R. has not offered us any reason to believe a continuance was reasonably likely to result in a different outcome or that the lack of a continuance denied her a fair trial.

**AFFIRMED.**